Frank W. TURNEY, Appellant,

v.

STATE of Alaska, Appellee.

No. A–5852.

Court of Appeals of Alaska.

Aug. 9, 1996.

J. John Franich, Assistant Public Advocate, Fairbanks, and Brant G. McGee, Public Advocate, Anchorage, for Appellant.

Joseph S. Slusser, Assistant District Attorney, Barrow, Harry L. Davis, District Attorney, Fairbanks, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

MANNHEIMER, Judge.

Frank W. Turney appeals his convictions for second-degree trespass, AS 11.46.330(a)(1), and disorderly conduct, AS 11.61.110(a)(2). Turney was prosecuted for these offenses as a result of his protest activities outside the state courthouse in Fair-

banks. On appeal, Turney asserts that his protest activities were protected by the First Amendment to the United States Constitution and Article I, Section 5 of the Alaska Constitution. For the reasons explained in this opinion, we reverse Turney's trespass conviction but we affirm his disorderly conduct conviction.

Since 1990, Turney has been demonstrating at the Fairbanks courthouse in support of the "Fully Informed Jurors Association". Turney believes that jurors should be told of their power to engage in "jury nullification"—a jury's effective power to disregard a trial judge's instructions and refuse to enforce laws they disagree with.

In March 1994, Turney acquired a bullhorn, and his demonstrations both inside and outside the courthouse grew increasingly aggressive and disruptive. Ronald J. Woods, the Area Court Administrator for the Fourth Judicial District, received complaints from both jurors and court staff that Turney had disrupted proceedings with his protests. Among his other activities, Turney would stand outside the wall of the jury assembly area and yell with his bullhorn. At other times, Turney would bleat like a sheep at the prospective jurors and he would beat on the doors of the room, disrupting not only the jury assembly proceedings but also other court proceedings in adjoining areas of the building.

Brenda Richard, a jury clerk, testified that the court's jury orientation sessions were often disrupted by Turney's loud protests outside the jury assembly room. When Richard tried to deter Turney by closing the window blinds, Turney would yell even louder and would come closer to the building or would go around to the glass door to the jury assembly room (which had no blinds). Rita Roy, another jury clerk, testified that Turney engaged in protests outside the juror assembly room every day that jury trials were held in the courthouse. His stridency was not only disruptive and distracting to the potential jurors, but also so distressing to Roy personally that it became emotionally difficult for her to do her work.

On the morning of May 9, 1994, Woods hand-delivered a letter to Turney concerning his protest activities. In this letter, Woods told Turney that he was welcome to enter court property "to peaceably conduct court business or to observe court proceedings". Woods also told Turney that he could continue to use the sidewalks encircling the courthouse as a site for his protests, since these sidewalks "are a traditional public forum, subject only to reasonable time, place, and manner restrictions". However, Woods informed Turney that he was now "prohibited from entering or remaining on court property to engage in protest activities, picketing, or pamphleteering". Woods also told Turney that he was "prohibited from making excessive noise that disrupts or interferes with court business".

Approximately two months later, on the morning of July 13th, Turney was again outside the jury assembly room of the Fairbanks courthouse. Using his bullhorn, Turney shouted at the windows of the jury assembly room and bleated like a sheep. Brenda Richard was showing a juror orientation videotape to the potential jurors. She testified that Turney's amplified shouting made it difficult for prospective jurors to listen to the videotape and to hear Richard's instructions. She noted that prospective jurors were "distracted" by Turney's shouting and that some of the prospective jurors questioned her about Turney.

Richard called the Judicial Services Section of the Alaska State Troopers to complain that Turney was again using a bullhorn outside the jury assembly room. One of the troopers went outside and asked Turney to leave. Turney complied with this request. On the basis of this incident, Turney was charged with trespass and disorderly conduct. A jury convicted Turney of both counts.

*The Trespass Conviction*

Turney argues that the State failed to prove that he committed a trespass. Under AS 11.46.330(a)(1) and AS 11.46.350(a)(1)–(2), the crime of trespass can be committed in two ways pertinent to Turney's case.

First, trespass is committed when a person enters or remains upon property at a time

when the property "is not open to the public and ... the defendant is not otherwise privileged to [be there]". AS 11.46.350(a)(1). The trial judge in Turney's case ruled that Turney could not be convicted under this section because Turney conducted his protest activities during normal business hours when the courthouse and its surrounding grounds were open to the public.

Second, trespass is committed when a person enters property that is open to the public but then "fail[s] to leave ... after being lawfully directed to do so personally by the person in charge [of the property]". AS 11.46.350(a)(2). The trial judge ruled that the State could proceed under this theory of trespass. The judge told the jurors that, in order to find Turney guilty of trespass, they had to find that Turney "knowingly remained unlawfully in or upon the premises of the courthouse, after personally being ordered to leave ... [and that he] recklessly disregarded a lawful order that he not remain."

The problem in Turney's case is to identify the "lawful order" directing him to leave the courthouse grounds. As noted in the introductory section of this opinion, Turney voluntarily ended his protest and left the courthouse grounds on July 13th when the trooper asked him to leave. Thus, Turney could not be convicted of ignoring the trooper's instructions on the day named in the complaint. Rather, the State's theory of prosecution was that Turney had committed trespass by returning to the courthouse to renew his protest activities after receiving Ronald Woods's letter on May 9th. As noted earlier, Woods's letter informed Turney that he was "prohibited from ... remaining on court property to engage in protest activities". This letter, the State contended, was the "lawful order" directing Turney to leave the courthouse property and never return to conduct protest activities.

The trial judge's instructions to the jury embodied this theory of the case. In particular, the trial judge instructed the jury:

[A]n owner or occupier of premises can put limits upon the right of another to enter or remain upon the premises. If the owner or occupier informs another of those limits, then that person ... may become a trespasser if he or she later enters upon the premises and exceeds those limits.

On appeal, Turney argues that he has a First Amendment right to engage in protest activity on court property. Turney contends that the court administrator had no authority to bar future protest activity on court property, and therefore Woods's letter to Turney constituted an unenforceable "prior restraint" on constitutionally protected speech.

■ The United States Supreme Court has indicated that similar restrictions on political activity at a courthouse are constitutional. *See United States v. Grace*, 461 U.S. 171, 177–78, 182, 103 S.Ct. 1702, 1707, 1709, 75 L.Ed.2d 736 (1983). However, we need not resolve this issue of First Amendment law to resolve Turney's appeal of his trespass conviction. The threshold question presented is purely one of trespass law. Even if we assume that, consistent with the First Amendment, the Area Court Administrator had the authority to bar Turney from protesting in and around the courthouse, there are two flaws in the State's theory of prosecution.

*"Unlawful Remaining", as Applied to Public Buildings and Surrounding Property, Requires that the Trespasser Refuse or Ignore a Contemporaneous Order to Leave.*

Turney was convicted under the theory of trespass codified in AS 11.46.350(a)(2): that he "fail[ed] to leave [the courthouse] premises ... after being lawfully directed to do so". Courts construing similar statutes generally hold that, when the property involved is a public building, a person does not commit a trespass unless the person ignores or refuses a contemporaneous request to leave. That is, this type of trespass statute does not authorize a government official to bar a person from returning to a public building and its surrounding property in perpetuity.

[A] statute may legitimately criminalize an act of peaceful but unauthorized presence on public property for purposes other than those to which the property has been dedicated[.] [But] a criminal trespass statute which [applies to] public property [in general], and which [proscribes] refusing

or failing to leave a public building or [public] grounds upon being requested to do so by an authorized employee[,] limits the power of public officials ... to notifying people, in specified circumstances, that they may not remain on the property and does not permit them to bar entry.

75 Am.Jur.2d 137, *Trespass*, § 179.

For instance, in *In re Appeal No. 631*, 282 Md. 223, 383 A.2d 684 (1978), the Maryland Court of Appeals construed a trespass statute which proscribed the act of "refusing or failing to leave a public building ... upon being requested to do so by [an] authorized employee". 383 A.2d at 686. The defendant in that case visited a junior high school after being told on previous occasions that he was not to return to the school property. He was taken to the vice-principal and asked to explain why he had come back to the school; when he failed to advance a satisfactory explanation for his presence, he was arrested. The Maryland court reversed the defendant's conviction:

> [T]he State concedes that at no time on [the day of the alleged trespass] was the defendant asked to leave the school premises. He was, rather, immediately arrested after failing to disclose to the vice-principal reasons sufficient to justify his presence. No request [to leave] having been given, there was none to disobey. It is true that the vice-principal had twice previously warned the defendant that he was "not to be on this property." These requests to leave, however, were given on occasions one or two weeks prior to the subject incident[.] [The trespass statute] makes a person's conduct criminal only when he "refuses or fails to *leave* the building or grounds of these institutions *after* being requested to do so by an authorized employee of the institution."

*In re Appeal No. 631*, 383 A.2d at 687 (emphasis in the original).

In *State v. Johnson*, 381 So.2d 498 (La. 1980), a case dealing with quasi-public property (a bus terminal), the defendant entered the terminal cafeteria and was arrested for trespassing because he had previously been ordered to leave the bus terminal and never return. The government conceded that, during the episode in question, the defendant was "at no time requested ... to leave the premises ... because of [the] prior warnings and admonitions". 381 So.2d at 499.

The Louisiana statute, 14:63:3A, defined trespass as the act of "go[ing] into or upon or remain[ing] in or upon ... any structure ... or [land] ... after having been forbidden to do so." Nevertheless, the Louisiana Supreme Court construed the statute to require

> a reasonably contemporaneous [oral] or written request to leave as an indispensable element of the offense.... "[R]easonably contemporaneous" ... does not necessarily mean a request immediately preceding the arrest of an alleged [trespasser]. We deem a request to be reasonably contemporaneous if given a few hours prior to the arrest, the same day as the arrest[,] or such other pre-arrest interval [as is] reasonable under the ... circumstances of each particular case. [But] it is patently unreasonable [to construe the trespass statute to allow] a citizen with peaceful intent [to] be permanently and perpetually barred from the premises of a public transportation facility[.]

*State v. Johnson*, 381 So.2d at 500.

This court has previously looked to judicial decisions construing New York Penal Law § 140.00 et seq. for aid in construing Alaska's trespass and burglary statutes. *See Johnson v. State*, 739 P.2d 781, 783 n. 1 (Alaska App.1987); *Arabie v. State*, 699 P.2d 890, 894–95 n. 3 (Alaska App.1985). In trespass cases dealing with orders to leave and not return, the New York courts recognize a distinction between public facilities and private property. Owners of private property (even private property open to the public for commercial purposes) may order a person to leave and never come back. If the person returns, he or she can be convicted of trespass for the mere act of returning. *People v. Licata*, 28 N.Y.2d 113, 320 N.Y.S.2d 53, 268 N.E.2d 787 (1971). This court enforced a similar ban imposed by the owner of private property in *Johnson v. State*, 739 P.2d 781 (Alaska App.1987): the defendant was convicted of trespass for returning to a ski resort after being ordered not to return to the premises for the rest of the season.

But, under New York's general trespass statutes, the supervisor of a public facility has no such power to bar an individual from ever returning to the facility. Even though a person has previously been ordered to leave and not return, this person may not be prosecuted for trespass merely for returning on another occasion. *People v. Marino*, 135 Misc.2d 304, 515 N.Y.S.2d 162, 165–66 (Justice Ct.1986); *People v. Hutchinson*, 124 Misc.2d 487, 477 N.Y.S.2d 965, 967–68 (Sup. Ct.1984); *People v. Wilson*, 122 Misc.2d 55, 469 N.Y.S.2d 905, 907 (City Ct.1983); *People v. DeClemente*, 110 Misc.2d 762, 442 N.Y.S.2d 931, 934–35 (City Crim.Ct.1981); *People v. Nuñez*, 106 Misc.2d 236, 431 N.Y.S.2d 650, 653 (City Crim.Ct.1980), *aff'd* 114 Misc.2d 573, 454 N.Y.S.2d 290 (1982); *People v. Wolf*, 63 Misc.2d 178, 312 N.Y.S.2d 721, 724 (Dist. Ct.1970).[1]

We note that, in analogous situations, government agencies have obtained civil injunctions barring individuals from entering or using government properties for unauthorized purposes. *See*, for example, *United States v. Gilbert*, 920 F.2d 878 (11th Cir. 1991). In addition, both the federal government and various state governments have enacted statutes which empower public officials to bar individuals from returning to specified public facilities.[2] But the statute that Turney was charged with violating, AS 11.46.350(a)(2), is not this type of statute.

Alaska Statute 11.46.350(a)(2) is a general trespass statute which provides that a person may not remain on property after being lawfully ordered to leave. As explained above, this type of statute is generally construed not to grant officials the authority to permanently ban people from public facilities. We construe AS 11.46.350(a)(2) in accordance with these authorities and hold that this statute did not authorize the Area Court Administrator to permanently ban Turney from the courthouse property. A person can not be convicted under AS 11.46.350(a)(2) of "fail[ing] to leave" a public facility "after being lawfully directed to do so" unless the person fails to heed a reasonably contemporaneous directive to leave, or (as in *People v. Bembry*, cited in footnote 1) the person heeds the directive to leave but then returns to the public facility after only a short while.

In the present case, Woods's letter was delivered to Turney on May 9th. Turney returned to the courthouse on July 13th. Even if Woods's letter had purported to completely ban Turney from the courthouse grounds, the delivery of that letter was not sufficiently contemporaneous with Turney's act of returning to the courthouse to make Turney's action an "unlawful remaining".

*When a Person Lawfully Enters Property, the Person's Intent to Engage in Prohibited Activities on the Property Does Not, By Itself, Make the Person's Continued Presence an "Unlawful Remaining".*

As noted above, Woods's letter to Turney did not totally prohibit Turney from returning to the courthouse. Instead, Woods told Turney that he was welcome to come onto courthouse property for some purposes ("to peaceably conduct court business or to observe court proceedings") but that he was prohibited from "remaining on court property to engage in protest activities". Thus, the State could argue, Turney was free to enter the courthouse or its grounds, but he was on notice that he could not "remain" on court-

---

**1.** *Compare People v. Bembry*, 128 Misc.2d 243, 490 N.Y.S.2d 431, 432 (City Ct.1985): the defendant, who was ordered to leave a public office building and not return until he was sober, could properly be convicted of trespass for returning a few minutes later.

**2.** See, for example, Maryland Code, Article 27, Section 577B (discussed in *Appeal No. 631, supra*), which authorizes the highest official or governing body of any public school to deny access to the buildings or grounds of the institution to persons who are not registered as students, faculty, or staff of the institution and who "are acting in a manner disruptive or disturbing to the normal educational functions of the institution". The constitutionality of this statute was upheld in *Kirstel v. State*, 13 Md.App. 482, 284 A.2d 12 (1971). *See also People v. Leonard*, 62 N.Y.2d 404, 477 N.Y.S.2d 111, 114, 465 N.E.2d 831, 834 (1984) (discussing a similar regulation that authorizes the banning of individuals from New York university campuses); 18 U.S.C. § 1382 (authorizing the commander of a military installation to bar specified people from entering the base).

house property if he intended to renew his protest activities.

Under the State's theory, Woods's letter was a self-effectuating order directing Turney to desist from protest. Turney might have initially entered the courthouse property lawfully, but his subsequent decision to engage in protest (knowing that the Area Court Administrator had forbidden him to do so) turned his continued presence on the courthouse grounds into an unlawful "remaining" for purposes of the trespass statute. This appears to be the theory of prosecution embodied in the jury instructions in Turney's case.

Such a theory of criminal liability is inconsistent with both New York and Alaska decisions. In *People v. Graves*, 76 N.Y.2d 16, 556 N.Y.S.2d 16, 18, 555 N.E.2d 268, 270 (1990), a case dealing with the definition of burglary, the New York Court of Appeals carefully distinguished between the requirement of (1) an unlawful entry or remaining, and (2) the requirement of an intent to commit a crime. The New York court held that a defendant's secret intent to commit a crime does not turn an otherwise lawful entry or lawful presence into an unlawful entry or an unlawful remaining. Three decades before, the Alaska Supreme Court applied the same rule in *Smith v. State*, 362 P.2d 1071, 1073–74 (Alaska 1961). The court held that a defendant's lawful entry into a building does not become an "unlawful entry" for purposes of the burglary statute merely because the defendant at all times intended to commit a crime inside the building.[3] *See also Pushruk v. State*, 780 P.2d 1044, 1048 (Alaska App. 1989) (a trespasser who, inside the building, forms the intent to commit a crime does not thereby commit burglary); *Shetters v. State*, 751 P.2d 31, 36 n. 2 (Alaska App.1988) (rejecting the notion that a lawful presence on property is converted to an "unlawful remaining" when the person forms an intent to steal).

■ Thus, a defendant's intent to commit a crime does not convert his lawful presence on property into a trespass. Were the rule otherwise, a store owner could convert all shopliftings into burglaries by the expedient of posting a sign at the door informing customers that they are permitted to remain on the premises only as long as they intend to commit no crime.

■ We construe AS 11.46.350(a)(2) accordingly. When a person has lawfully entered a building or has lawfully entered upon property, that person does not "remain unlawfully" merely because the person engages in activities that the person knows are forbidden by the property owner. Although the person may be civilly and/or criminally liable for these prohibited actions, there is no trespass (unless, of course, the property owner becomes aware of the person's activities and asks the person to leave, and the person then refuses).

■ In the present case, the trial judge ruled (and the State effectively concedes) that Turney entered the courthouse grounds lawfully. (Turney entered the property during business hours, when the courthouse was open to the public.) We assume that Turney entered the property with the intention of renewing his protest activities—activities that Woods, the person in charge of the property, had explicitly forbidden. Nevertheless, neither Turney's intent to engage in protest on the courthouse grounds nor his actual renewal of protest activities was sufficient, by itself, to convert Turney's entry onto courthouse property into an "unlawful entry".

Because Turney committed no unlawful entry, the only other theory of criminal liability available to the State was that Turney had committed an "unlawful remaining". As explained above, before Turney could be convicted under AS 11.46.350(a)(2) of "unlawfully remaining" in a public facility, the State had to prove that Turney disregarded a reasonably contemporaneous directive to leave.

**3.** This was the rule at common law as well. "Because *breaking*, as an element of common-law burglary, requires a breach of the building made by *trespass*, it cannot be established by the act of one who had authority to open that very door at that particular time.... [O]pening a door to enter a store during regular business hours is not a *breaking* even if done with intent to steal." R. Perkins & R. Boyce, *Criminal Law* (3rd edition 1982), p. 250 (italics in the original).

Woods's letter to Turney was not a directive to leave; rather, it was a statement of the conditions placed on Turney's return to the courthouse. Moreover, even if Woods's letter could be construed as a conditional directive to leave (if Turney resumed his protest activities), it was delivered to Turney on May 9th; this directive was not reasonably contemporaneous with Turney's conduct on July 13th.

It is undisputed that Turney left the courthouse on July 13, 1994 without incident after the trooper asked him to leave. Turney therefore never committed an act of unlawful remaining on July 13th. We thus conclude that Turney committed no act of trespass on that day, and we reverse Turney's conviction for second-degree trespass.

### The Disorderly Conduct Conviction

Turney was convicted of disorderly conduct for violating AS 11.61.110(a)(2). In pertinent part, this statute defines the crime of disorderly conduct as "[making] an unreasonably loud noise" "in a public place[,] with intent to disturb the peace and privacy of another or with reckless disregard that [one's] conduct is [disturbing the peace and privacy of another] after being informed that [one's conduct] is having that effect". Turney raises two arguments against his conviction.

First, Turney asserts that all political advocacy is exempted from the disorderly conduct statute. Turney's argument turns on the definition of "noise" contained in AS 11.61.110(b):

> As used in [AS 11.61.110], "noise" is "unreasonably loud" if, considering the nature and purpose of the defendant's conduct and the circumstances known to the defendant, including the nature of the location and the time of day or night, the [defendant's] conduct involves a gross deviation from the standard of conduct that a reasonable person would follow in the same situation. *"Noise" does not include speech that is constitutionally protected.*

(Emphasis added.)

Turney asks this court to concentrate on the second (italicized) sentence of this defini-

tion. He argues that his advocacy of jury nullification was protected by the First Amendment (which generally protects all political advocacy). From this, Turney derives the proposition that his protest at the courthouse does not fall within the definition of "noise" because, under the second sentence of AS 11.61.110(b), "noise" does not include constitutionally protected speech. Thus, Turney concludes, he can not be convicted of disorderly conduct for engaging in constitutionally protected speech, even if his speech was "unreasonably loud" (as defined in the first sentence of the statute).

Admittedly, the second sentence of AS 11.61.110(b) could be read in the manner Turney suggests. However, under such a reading, a protester could station himself on the street outside a political opponent's window and shout all night through an amplifier without violating the disorderly conduct statute (as long as he was shouting about political or social issues). Similarly, a protester could use a bullhorn in the hallways of a courthouse to disrupt court proceedings throughout the day.

Moreover, the phrase "constitutionally protected speech" encompasses more than political advocacy. For instance, the First Amendment protects truthful commercial speech. *See 44 Liquormart, Inc. v. Rhode Island,* —— U.S. ——, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996). If the second sentence of AS 11.61.110(b) were read as Turney suggests, then merchants who blared advertisements for their wares over a loudspeaker as they drove through residential neighborhoods at three o'clock in the morning could not be prosecuted for disorderly conduct (since commercial speech is "constitutionally protected").

We doubt that the legislature's intent when enacting the second sentence of AS 11.61.110(b) was to create such broad exemptions to the law's regulation of disruptive noise. Rather, the legislative history of AS 11.61.110(b) strongly suggests that the second sentence of the statute was intended to clarify that AS 11.61.110(b) should not be interpreted to interfere with First Amendment rights.

As drafted by the Criminal Code Revision Subcommission, proposed 11.61.110(b) originally read:

> As used in [TD 11.61.110], "unreasonably loud noise" means noise which constitutes a gross deviation from the standard of conduct that a reasonable person would follow in the same situation as the defendant, considering the nature and purpose of the conduct of the defendant and the circumstances known to him, including the nature of the location and the time of day or night.

*Alaska Criminal Code Revision, Tentative Draft*, Vol. 5, p. 79. In their commentary to this section, the drafters stated:

> In *Marks[ v. Anchorage*, 500 P.2d 644, 653 (Alaska 1972)], the [supreme] court noted that the phrase "unreasonable noise" without more might be considered "indefinite." Subsection (b) both clarifies the meaning of "unreasonably loud" and insures that free speech will not be infringed upon by requiring that noisemaking constitute a "gross deviation from the standard of conduct that a reasonable person would follow in the same situation." The intent of the Subcommission is clear: the legitimate exercise of first amendment rights can never constitute disorderly conduct.

*Tentative Draft*, Vol. 5, p. 86.

The legislature departed from the Tentative Draft by enacting a two-sentence version of AS 11.61.110(b). The first sentence of the statute is a reworded variant of the tentative draft:

> As used in [AS 11.61.110], "noise" is "unreasonably loud" if, considering the nature and purpose of the defendant's conduct and the circumstances known to the defendant, including the nature of the location and the time of day or night, the [defendant's] conduct involves a gross deviation from the standard of conduct that a reasonable person would follow in the same situation.

The legislature then added a second sentence of their own device:

> "Noise" does not include speech that is constitutionally protected.

The purpose of this second sentence was apparently to codify the limitation contained in the Criminal Code Revision Subcommission's commentary: that "the legitimate exercise of first amendment rights can never constitute disorderly conduct". This legislative purpose is expressed in the legislature's commentary to AS 11.61.110(b) (a commentary that mirrors the Subcommission's commentary to the Tentative Draft):

> In *Marks v. City of Anchorage*, 500 P.2d 644 (Alaska 1972), the court noted that the phrase "unreasonable noise" without more might be considered "indefinite." Subsection (b) both clarifies the meaning of unreasonably loud noise and insures that free speech will not be infringed upon by specifically providing that "noise" does not include speech that is constitutionally protected. Under the Code the exercise of protected first amendment rights can never constitute disorderly conduct.

1978 Senate Journal, Supp. No. 47 (June 12), p. 95.

According to Turney's argument, the second sentence of AS 11.61.110(b) means that the *disorderly conduct statute simply does not apply to any speech afforded protection under the First Amendment*. But the legislative commentary to this sentence states that the purpose of this second sentence was to insure that "the exercise of *protected* first amendment rights can never constitute disorderly conduct". (The legislature's commentary tracks the commentary to the tentative draft, which speaks of "the *legitimate exercise* of first amendment rights".)

There is a crucial difference between engaging in speech that is protected by the First Amendment and "exercis[ing] ... protected first amendment rights". Even though political and commercial speech is protected by the Constitution, the government retains the power to regulate the time, location, and manner in which that speech is disseminated. The United States Supreme Court has "regularly rejected the assertion that people who wish to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please". *United States v. Grace*, 461 U.S. at 177–78, 103 S.Ct. at 1707. Rather,

the government can place reasonable restrictions on the time, place, and manner of political protest. *Grace*, 461 U.S. at 177, 183–84, 103 S.Ct. at 1707, 1710. The Alaska Supreme Court has recognized that, consistent with the First Amendment, a state government can "limit speech or assembly in specific places under limited circumstances, as, for example, in a courtroom while the court is in session". *Marks v. Anchorage*, 500 P.2d 644, 647 (Alaska 1972). *See Fardig v. Anchorage*, 803 P.2d 879, 882–83 & 883 n. 4 (Alaska App.1990) (discussing the limitations that a government can legitimately place on political speech occurring on public property).

The wording of AS 11.61.110(b)'s second sentence—the declaration that "noise" does not include "speech that is constitutionally protected"—is admittedly susceptible of the reading Turney suggests. But the fundamental question in this case is to ascertain the legislative purpose behind that second sentence. *See Millman v. State*, 841 P.2d 190, 194 (Alaska App.1992) ("The guiding principle of statutory construction is to ascertain and implement the intent of the legislature[.]").

The legislative commentary adopted with the statute declares that the second sentence of AS 11.61.110(b) was intended to insulate "the exercise of protected first amendment rights" from prosecution under the disorderly conduct statute. The legislature apparently believed that this intention was perfectly expressed in the second sentence of AS 11.61.110(b). But, as discussed above, the government is authorized to regulate the time, place, and manner in which people engage in speech, even if that speech is protected by the First Amendment. In other words, people engaged in constitutionally protected speech are not necessarily engaged in activity that is protected from criminal prosecution by the First Amendment.

Under Turney's suggested interpretation of AS 11.61.110(b), political protesters and fish mongers alike could bellow their messages at all hours of the day in any location they chose, disrupting other people's business and sleep without restraint. Turney suggests no rationale for exempting such behavior from the disorderly conduct statute,

and we can think of none. The First Amendment requires no such exemption.

In ascertaining the legislature's intent, this court "is obliged to avoid construing statutes in a way that leads to patently absurd results or to defeat of the obvious legislative purpose behind the statute". *State v. Lowrence*, 858 P.2d 635, 638 (Alaska App.1993). We conclude that the second sentence of AS 11.61.110(b) was not intended to create a wholesale exemption for political and commercial speech irrespective of time, place, or decibel level. Rather, the second sentence embodies the legislature's intention that the disorderly conduct statute not be used to prosecute activity that is protected from prosecution by the First Amendment.

Turney argues that, if the second sentence is construed in this way, it becomes superfluous: no criminal statute can lawfully be used to prosecute activity that is protected from prosecution by a provision of the Constitution. However, as we read AS 11.61.110(b), the second sentence of the statute modifies and clarifies the first sentence.

The first sentence of AS 11.61.110(b) declares that conduct can be prosecuted if it constitutes a "gross deviation from the standard of conduct that a reasonable person would follow in the same situation". The second sentence, by exempting the legitimate exercise of First Amendment rights, clarifies that the existence of this "gross deviation" must be gauged only by reference to the time, place, and manner in which a speaker delivers his or her message, and not the substantive content of the speech itself. In other words, no matter how "unreasonable" the speaker's message, the content of that message can not be used to determine whether the speaker's conduct deviated from "the standard of conduct that a reasonable person would follow in the same situation".

We therefore reject Turney's assertion that the disorderly conduct statute exempts all political speech. If Turney engaged in "unreasonably loud" protest at the courthouse (as defined in AS 11.61.110(b)), he could be prosecuted for violating the disorderly conduct statute.

Turney argues in the alternative that, if the disorderly conduct statute is construed to cover unreasonably loud political protest, then the statute is unconstitutional. Turney contends that the disorderly conduct statute is both overbroad and vague.

To support his constitutional challenge, Turney relies primarily on *Marks v. Anchorage.* In *Marks,* the supreme court dealt with a now-superseded disorderly conduct statute. That statute proscribed "making unreasonable noise" with "intent to cause public inconvenience, annoyance[,] or alarm". 500 P.2d at 645. The supreme court concluded that the terms "unreasonable", "inconvenience", "annoyance", and "alarm" were all too vague to give adequate notice of what conduct was prohibited, and were so broad as to stifle many forms of speech protected by the First Amendment. 500 P.2d at 652–53.

However, Turney was not prosecuted under the older statute interpreted in *Marks.* Rather, Turney was prosecuted under the current disorderly conduct statute, AS 11.61.110. In *Earley v. State,* 789 P.2d 374, 376 n. 2 (Alaska App.1990), this court upheld AS 11.61.110 against both overbreadth and vagueness challenges.

Turney completely ignores *Earley.* His opening brief does not cite the case. Even after the State's brief pointed out that *Earley* was the controlling authority on Turney's constitutional claims, Turney failed to discuss (or even acknowledge) *Earley* in his reply brief. Turney's pointed refusal to address a controlling decision of this court must be interpreted as a tacit concession that *Earley* is dispositive of Turney's overbreadth and vagueness challenges to the disorderly conduct statute.

*Conclusion*

Turney's conviction for second-degree trespass is REVERSED. His conviction for disorderly conduct is AFFIRMED.