STATE of Tennessee, Appellee,

v.

**Lorenzo Edward ERVIN, Appellant.**

Court of Criminal Appeals of Tennessee, at Knoxville.

March 16, 2000.

Application for Permission to Appeal Denied by Supreme Court Feb. 12, 2001.

 

 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 

Ardena J. Garth, District Public Defender, Donna Robinson Miller, Assistant District Public Defender, On Appeal, Chattanooga, TN, Dwight Aarons, Associate Professor, Amicus Curiae, Knoxville, TN, Charles G. Wright, Jr., At Trial, Chattanooga, TN, for the appellant.

Paul G. Summers, Attorney General & Reporter, Todd R. Kelley, Assistant Attorney General, Nashville, TN, William H. Cox, III, District Attorney General, Thomas Evans, Assistant District Attorney General, Chattanooga, TN, for the appellee.

## OPINION

ALAN E. GLENN, Judge.

The defendant, Lorenzo Edward Ervin, was indicted by a Hamilton County Grand Jury for disrupting a meeting or procession in violation of Tennessee Code Annotated § 39–17–306. A jury returned a verdict of guilty on April 4, 1994. The trial court denied the defendant's motion for a new trial, and the defendant filed a timely notice of appeal. On November 28, 1995, this court dismissed the appeal and held the defendant's attorney in contempt for failure to comply with his responsibilities on appeal. In 1997, the defendant filed a petition for post-conviction relief in the Criminal Court of Hamilton County. On December 3, 1997, the trial court granted the defendant a delayed appeal and ordered the remainder of the petition to be held in abeyance. The trial court denied the defendant's second motion for a new trial on January 30, 1998. The defendant appealed, listing two basic assignments of error:

 I. Tennessee Code Annotated § 39–17–306 is unconstitutional in that it places an unreasonable restraint on the exercise of freedom of speech and is overbroad.

 II. The evidence was insufficient as a matter of law to support the jury's verdict.

Based upon our review, we affirm the conviction.

## FACTS

Although the record is not entirely clear on the background of this matter, it appears that there had been protests and marches in downtown Chattanooga during the several days prior to May 13, 1993, which was the date of the offense with which the defendant was charged. Apparently, these gatherings were to protest the fact that the Hamilton County Grand Jury had not indicted eight police officers following the death of an individual named Larry Powell. According to the trial testimony, there were no other arrests during these demonstrations, which occurred approximately two days before and two days after May 13. On that date, because of a disruption which occurred during the dedication ceremony of a Law Enforcement Memorial for officers who had fallen in the

line of duty, the defendant was arrested and charged with violation of Tennessee Code Annotated § 39–17–306. He was convicted of this offense and sentenced to confinement for six months in the Hamilton County Workhouse. However, the defendant's sentence was suspended upon his completion of ten days of "public works," which was also suspended upon the defendant's submitting proof to the trial court of his attending school to obtain his doctorate degree.

The trial in this matter was held on April 3, 1994. The State's first witness was Ralph Cothran, who was the chief of the Chattanooga Police Department and had been with the department for twenty-nine and one-half years. He testified that a site had been selected adjacent to the Justice Building in Chattanooga for a memorial for police officers who had fallen in the line of duty. A dedication and memorial service was planned for May 13, 1993, and the Chattanooga City Commission had passed a resolution allowing certain streets to be blocked off for the ceremony. Apparently, during the period from a few days before this ceremony until a few days following it, a group had protested and marched in the area. However, according to Cothran, the protests did not result in arrests other than those that occurred because of the disruption of the memorial service itself. Cothran testified that as the memorial service began, one of the demonstrators began using a "battery-powered microphone that was quite loud:"

> Well, as the memorial, as the memorial began, got started, several demonstrators who were on the landing of the Justice Building marched down behind the family of fallen officers and began to chant, "Stop killer cops," I believe or something to that nature.

At that point, those chanting were arrested and taken to another area.

The master of ceremonies for the event was Earl Freudenberg who testified the "protesting" began as he was making his opening remarks. The protesting caused him to lose his train of thought, but he continued to read his "prepared remarks."

Captain Paul Calloway of the Chattanooga Police Department testified that he was present as the ceremony was beginning at approximately 10:00 a.m. on May 13, 1993, and that the Hamilton County Honor Guard had "marched down to stand behind the families [of officers who had fallen in the line of duty]." He testified that the defendant and approximately seven other people marched behind the Honor Guard. The defendant, utilizing a megaphone, and the rest of the group were shouting, "Stop killer cops." After they had shouted this "three or four times," the group was arrested. Calloway stated that the group of protesters was "exactly behind" those who were attending the ceremony.

Several of the witnesses who testified were persons attending the ceremony because they were relatives of police officers who had been slain in the line of duty.

Buford Duggan, who was attending with his wife and son, and whose uncle had been killed in the line of duty, testified concerning the disturbance, which occurred behind him:

> Me and my wife got there just a short time before the meeting started and I believe Mr. Freudenberg gave the welcoming address and then invocation and then the color guard came through and there was a lot of disturbance, you know, coming in from behind. We were seated there where the memorial plaque is going to be erected and it just drowned out the whole program, it had to stop.

Duggan then provided additional details about the disturbance:

I didn't know what in the world was happening. I looked around and I got a glimpse of people coming in and one fellow had a bullhorn making a lot of noise. The best I could tell it was a chant saying, "Kill the cops, kill the cops, kill the cops." That's the way it sounded to me.

Wendell Shipley, who was attending because his father had been killed in the line of duty in 1953, testified that those protesting were "right close" behind him. He said that as the group was "shouting and hollering over their bullhorn 'Killer cops, killer cops,'" he "couldn't hear anything [of the ceremony]."

Preston Hess, attending the ceremony with his parents and a brother to honor another brother who had been killed in the line of duty in 1978, identified the defendant as the person with the megaphone and described what happened:

Mr. Freudenberg got up, started to speak and he had said two or three words, not very much at all and I don't know what his name is, the gentleman with the sunglasses picked up, came out with a megaphone and started chanting "stop killer cops," and then the rest of them were chanting along with him and it was really disruptive, it got to where you couldn't hardly hear Mr. Freudenberg, and he got so—he got kind of confused and he couldn't remember where he was at and trying to talk and it was just—it was just disruptive and, so, the police came in and then escorted them off.

According to Hess, the protesters "were still chanting as they went off."

The only witness to testify for the defense was Clifford Eberhardt, editor of a weekly newspaper in Chattanooga, who testified that he was with the group of demonstrators and that they were unaware that a memorial service was going on at the time of the protest.

## ANALYSIS

### I. Constitutionality of Statute

In this case, we must decide whether a legislative enactment designed to protect the right of assembly of citizens unduly burdens the First Amendment rights of other citizens. The defendant argues that his conviction under Tennessee Code Annotated § 39–17–306 should be overturned because the statute is unconstitutional in that it places an unreasonable restraint on freedom of speech and is overbroad, in violation of the First Amendment of the United States Constitution.[1]

### A. Restraint on Freedom of Speech

Tennessee Code Annotated § 39–17–306 states the following:

> (a) A person commits an offense if, with the intent to prevent or disrupt a lawful meeting, procession, or gathering, the person substantially obstructs or interferes with the meeting, procession, or gathering by physical action or verbal utterance.

> (b) A violation of this section is a Class B misdemeanor.

The defendant assails the statute as being an unconstitutional restraint on his First Amendment right of free expression. Be-

1. This amendment is applicable to the states through the Fourteenth Amendment. The defendant also claims violation of Article I, § 19 of the Tennessee Constitution. Our supreme court has determined that Article I, § 19 is to be construed as having "a scope at least as broad as that afforded those freedoms by the first amendment of the United States Constitution." *Leech v. American Booksellers Ass'n, Inc.,* 582 S.W.2d 738, 745 (Tenn.1979).

fore addressing defendant's argument that his First Amendment rights have been abridged, we examine the nature of those rights.

### (1) Nature of First Amendment Rights

■ The First Amendment to the United States Constitution provides that:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

The protection of free speech has been characterized in First Amendment jurisprudence as a "fundamental" liberty. "Of that freedom one may say that it is the matrix, the indispensable condition, of nearly every other form of freedom." *Palko v. Connecticut,* 302 U.S. 319, 327, 58 S.Ct. 149, 152, 82 L.Ed. 288, 293 (1937). The First Amendment contemplates that "the ultimate good desired is better reached by free trade in ideas—that the best test of truth is the power of the thought to get itself accepted in the competition of the market...." *Abrams v. United States* 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting). The choices that government may make in an effort to regulate or prohibit speech are limited. *See Consolidated Edison Co. of New York, Inc. v. Public Service Comm'n of New York,* 447 U.S. 530, 538, 100 S.Ct. 2326, 2333, 65 L.Ed.2d 319 (1980) ("[G]overnments must not be allowed to choose which issues are worth discussing or debating."). Our country's history is replete with examples of the power of free speech to bring about positive change when even the least powerful among us are afforded the right to place ideas, often unpopular ideas, out in the marketplace. The Civil Rights Movement is just one such example.

■ Nevertheless, the First Amendment right of free speech is "not absolute at all times and under all circumstances." *Chaplinsky v.. New Hampshire,* 315 U.S. 568, 571, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942). The notion is well accepted that "the First Amendment does not guarantee the right to communicate one's views ... in any manner that may be desired." *Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 647, 101 S.Ct. 2559, 2563, 69 L.Ed.2d 298 (1981). The Supreme Court has stated:

> The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy.

*Cox v. Louisiana,* 379 U.S. 536, 554, 85 S.Ct. 453, 464, 13 L.Ed.2d 471 (1965). The states may, for instance, by narrowly drawn statutes, prohibit: obscenity, *see Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); child pornography, *see New York v. Ferber,* 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982); "fighting words," *Chaplinsky,* 315 U.S. at 572, 62 S.Ct. at 769; and incitement to imminent lawless activity, *see Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). Nevertheless, "the line between speech unconditionally guaranteed and speech which may legitimately be regulated, suppressed, or punished is finely drawn." *Speiser v. Randall,* 357 U.S. 513, 525, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958). "Because First Amendment freedoms need breath-

ing space to survive, government may regulate in the area only with narrow specificity." *NAACP v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963). That regulation is particularly difficult when government action results from an "accommodation" of the right of free speech with another fundamental right. *See Burson v. Freeman,* 504 U.S. 191, 211, 112 S.Ct. 1846, 1858, 119 L.Ed.2d 5 (1992) (holding that "requiring solicitors to stand 100 feet from entrances to polling places does not constitute an unconstitutional compromise"); *Bering v. SHARE,* 106 Wash.2d 212, 721 P.2d 918, 920 (1986) ("No judicial task is more difficult than balancing the constitutional rights and freedoms of citizens of this country against conflicting rights and freedoms of their fellow citizens.").

■ The First Amendment also protects the "right of the people peaceably to assemble." The same right of assembly is protected in Article I, § 23 of the Constitution of Tennessee.[2] The Supreme Court has stated that "[i]t is the right of the public to receive suitable access to social, political, esthetic, moral and other ideas and experiences...." *Red Lion Broadcasting Co. v. Federal Communications Comm'n,* 395 U.S. 367, 390, 89 S.Ct. 1794, 1807, 23 L.Ed.2d 371 (1969). The rights of citizens to assemble for their common good, whether social, political, esthetic, or moral, may come in conflict with the rights of other citizens to express their views. Neither right is absolute.

■■ The right to assemble does not guarantee a silent meeting. A meeting may be interrupted by loud voices. "[A] function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging." *Terminiello v. Chicago,* 337 U.S. 1, 4, 69 S.Ct. 894, 896, 93 L.Ed. 1131 (1949). Other interruptions or disturbances may substantially impinge on the right of assembly. In *Kovacs v. Cooper,* the Supreme Court stated:

> Opportunity to gain the public's ears by objectionably amplified sound on the streets is no more assured by the right of free speech than is the unlimited opportunity to address gatherings on the streets. The preferred position of freedom of speech in a society that cherishes liberty for all does not require legislators to be insensible to claims by citizens to comfort and convenience. To enforce freedom of speech in disregard of the rights of others would be harsh and arbitrary in itself.

*Kovacs v. Cooper,* 336 U.S. 77, 87–88, 69 S.Ct. 448, 454, 93 L.Ed. 513 (1949) (footnotes omitted). "[T]he state retains a legitimate concern in ensuring that some individuals' unruly assertion of their rights of free expression does not imperil other citizens' rights of free association and discussion." *In re Kay,* 1 Cal.3d 930, 83 Cal.Rptr. 686, 464 P.2d 142, 149 (1970) (en banc) (Traynor, C.J.). In *Turney v. State,* 922 P.2d 283, 291 (Alaska Ct.App.1996), the defendant demonstrated on behalf of the Fully Informed Jurors Association at the Fairbanks, Alaska, courthouse. Turney engaged in activities such as yelling with his bullhorn, bleating at prospective jurors like a sheep, and beating on doors. Upholding Turney's conviction for disor-

---

**2.** That section states:

Right of Assembly.—That the citizens have a right, in a peaceable manner, to assemble together for their common good....

derly conduct, the court observed that if it accepted the argument that the defendant's activities were absolutely protected by the First Amendment, it would mean that, for instance:

> a protester could station himself on the street outside a political opponent's window and shout all night through an amplifier without violating the disorderly conduct statute (as long as he was shouting about political or social issues). Similarly, a protester could use a bullhorn in the hallways of a courthouse to disrupt court proceedings throughout the day.

*Turney,* 922 P.2d at 290. As the *Turney* court noted, "[t]here is a crucial difference between engaging in speech that is protected by the First Amendment and 'exercis[ing] . . . protected first amendment rights.'" *Id.* at 291. Political speech may be protected by the Constitution, but the government retains a limited power to regulate the exercise of that speech in a reasonable manner. *Id.*

### (2) Test of Constitutionality

We turn now to the principle issue upon which this case will be resolved: whether Tennessee Code Annotated § 39–17–306 is a constitutional restraint on free speech. We note first that the defendant's words were expressive speech subject to the ambit of protection of the First Amendment. Thus, the defendant rightfully invokes the First Amendment. We also note that the speech in this case occurred on public streets—locations that have been "held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Kunz v. New York,* 340 U.S. 290, 293, 71 S.Ct. 312, 315, 95 L.Ed. 280 (1951) (quoting *Hague v.*

*C.I.O.* 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939)). In such a location, the "government may not prohibit all communicative activity." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983). Nevertheless, the state may legitimately regulate verbal expression in a public forum under certain circumscribed limits. *See Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984) ("Expression, whether oral or written or symbolized by conduct, is subject to reasonable time, place, and manner restrictions."). The state may "enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry Educ. Ass'n,* 460 U.S. at 45, 103 S.Ct. at 955. This is the standard we apply to the issue of the constitutionality of Tennessee Code Annotated § 39–17–306.

First, we must determine whether the statute is content-neutral. The principal inquiry is:

> whether the government has adopted a regulation of speech because of disagreement with the message it conveys. The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.

*Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2754, 105 L.Ed.2d 661 (1989) (citations omitted). For instance, content-neutral laws aim at expression but for reasons unrelated to its con-

tent.[3] Government regulation is content-neutral so long as it is "justified without reference to the content of the regulated speech." *Community for Creative Non Violence*, 468 U.S. at 295, 104 S.Ct. at 3070.

■ Tennessee Code Annotated § 39–17–306 makes no reference to any particular message. Its purpose is to protect the rights of citizens to lawfully assemble for their common good.[4] The language of the present statute makes no reference at all to the purpose of the assembly or to the content of the "verbal utterance" of the person violating the statute. It is content-neutral in that it does not criminalize any particular type of speech, rather it prohibits only speech or actions which disrupt lawful meetings or processions. The nature of the interference is gauged only by reference to the manner in which the speaker delivers his or her message, and not to the substantive content of the speech itself.

The defendant, while conceding that the statute is content-neutral as written, asserts that it was applied in a content-discriminatory manner as to him. The defendant suggests that had he been loudly supporting the police instead of condemning them, he would not have been arrested. This is pure speculation on his part and does not bring into question the content-neutral nature of the statute as written. We conclude that both the language itself and the justification for the

statute have nothing to do with content, and, therefore, the statute satisfies the requirement that time, place, or manner regulations be content-neutral.

■ Second, we must determine whether the statute is "narrowly tailored to serve a significant governmental interest." The requirement that a statute be narrowly tailored is satisfied "so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *United States v. Albertini*, 472 U.S. 675, 689, 105 S.Ct. 2897, 2906, 86 L.Ed.2d 536 (1985). The statute mandates that an individual can only be convicted of criminal conduct under specified circumstances. Specifically, it prohibits an individual from substantially obstructing or interfering with a lawful "meeting, procession, or gathering" with the intent of preventing or disrupting it. Here the interest of the government is substantial, even compelling, in that it is aimed at balancing the fundamental right of assembly with that of free speech. That interest would be less effectively achieved were the government to allow "substantial obstruction or interference" with any lawful assembly of its citizens in the name of protecting the First Amendment right to free speech.

■ The defendant argues that the statute is not narrowly tailored because it covers all types of meetings, both private and public. We disagree. The govern-

---

**3.** Such laws might limit the decibel level of amplified sound systems, as in *Ward v. Rock Against Racism*, 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989), where the government's objective was to balance appropriate sound quality in an outdoor theater, with respect for nearby residential neighbors and users of quiet zones in the park; or limit the activity of protesters, as in *Schenck v. Pro-Choice Network of Western New York*, 519 U.S. 357, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997),

where the state sought to insure safe access to health care facilities.

**4.** Like many early statutory and common law prohibitions against disturbing meetings, the statute at issue here was originally designed "to protect to the citizens of this State the right to worship their God according to the dictates of their conscience without interruption." *Ford v. State*, 210 Tenn. 105, 355 S.W.2d 102, 103–04 (1962).

ment's interest in protecting the right of lawful assembly is not limited by location. The fact that the statute may apply to a variety of meeting places simply renders it comprehensive and preserves its content neutrality.

The defendant also argues that no significant governmental interest is served by this statute because the statute serves only to prevent the inconvenience of interruption and to prohibit dissent from a memorial service.[5] Again, we disagree. The statute is not aimed at mere "inconvenience." To the contrary, the statute prohibits intentional, substantial obstruction with a lawful meeting. Further, as we have concluded, the statute is free of any content restrictions. We conclude that the state's significant interest in protecting the fundamental right of assembly is served in a direct and effective way by the prohibition against the intentional and substantial obstruction of a lawful meeting. Therefore, the statute satisfies the requirement that time, place, or manner regulations be narrowly tailored to serve a significant governmental interest.

Third, and finally, we must determine whether the operation of the statute leaves open ample alternative channels of communication. This requirement is easily met. Tennessee Code Annotated § 39–17–306 leaves open ample alternative channels of communication because the statute prohibits only conduct that disrupts meetings, processions, or gatherings. The defendant and the other protesters were free to voice their opinions in a location that did not disrupt the service. In fact, they had apparently been doing so without incident over a period of time prior to and subsequent to the memorial service. The defendant has made no showing that the ave-

nues of communication remaining available to him were in any way inadequate. *See, e.g., Kovacs v. Cooper,* 336 U.S. 77, 88–89, 69 S.Ct. 448, 454, 93 L.Ed. 513 (1949) (holding that it is "not enough to call forth constitutional protection for what those charged with public welfare reasonably think is a nuisance when easy means of publicity are open").

Based upon these considerations, we conclude that Tennessee Code Annotated § 39–17–306 is valid under the First Amendment as a reasonable time, place, and manner regulation of expression.

## B. Overbroad

The defendant also contends the statute is overbroad. A statute may be overbroad if its language is not vague, but literally encompasses constitutionally protected activity. *State v. Forbes,* 918 S.W.2d 431, 448 (Tenn.Crim.App.1995) (citing *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972)). Our supreme court has stated:

> It is well recognized, however, that "[a] facial challenge to a legislative Act is ... the most difficult challenge to mount successfully since the challenger must establish that no set of circumstances exist under which the Act would be valid." *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987).
>
> . . . .
>
> When a statute regulating conduct plus speech is at issue, the overbreadth must be "real" and "substantial" in relation to the statute's "plainly legitimate sweep" before the law should be invalidated on its face, and if an ambiguous

---

**5.** The defendant's reliance on *Boos v.Barry,* 485 U.S. 312, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988), is misplaced since the issue in *Boos* was the constitutionality of a content-based provision.

term has created a constitutional problem which may be solved by construction, courts have a duty to do so. *[American Booksellers Ass'n v. Rendell,* 332 Pa.Super. 537, 481 A.2d 919, 941 (1984) ].

*Davis–Kidd Booksellers, Inc. v. McWherter,* 866 S.W.2d 520, 525–26 (Tenn.1993).

To determine whether a statute reaches a substantial amount of constitutionally protected "conduct plus speech," [6] we must first interpret the language and scope of the prohibition. On its face, this statute does not prohibit speech or other expressive conduct unless the character of the conduct, not its message, "substantially obstructs or interferes with" a lawful meeting. The term "substantial," in this context, means major, consequential, or significant. Further, the statute does not attempt to punish protected conduct unless the actor acts or speaks with the specific intent to "prevent or disrupt a lawful meeting." Only conduct or speech that meets these qualifications is punishable.[7]

▆ To effectuate Tennessee Code Annotated § 39–17–306 within constitutional limits, we interpret it to require that the defendant substantially obstruct the conduct of a lawful meeting with the specific intent of bringing the meeting to an early termination or effectively impairing the conduct of the assemblage. In applying these standards, we are mindful that the nature of the meeting or gathering is necessarily relevant. A level of disruption to be expected at an outdoor political gather-

ing, see *In re Kay,* 1 Cal.3d 930, 83 Cal. Rptr. 686, 464 P.2d 142 (1970) (en banc) (Traynor, C.J.), is not what would be reasonably expected at a memorial service for slain officers.

We conclude that Tennessee Code Annotated § 39–17–306 can be authoritatively construed to conform to the legislative purpose of protecting the First Amendment rights of its citizens to peaceably assemble without impermissibly criminalizing a substantial amount of protected expressive activity and is, therefore, constitutionally valid.

## II. Sufficiency of the Evidence

▆ When a challenge is made to the sufficiency of the evidence, the standard for appellate review is whether, after considering the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The defendant's burden of showing insufficiency is heavy, since all conflicts in testimony are resolved in favor of the State, and the State is entitled to the strongest legitimate view of the evidence as well as all reasonable or legitimate inferences that may be drawn therefrom. *State v. Burns,* 979 S.W.2d 276, 287 (Tenn.1998).

▆ To obtain a conviction under Tennessee Code Annotated § 39–17–306, the State must prove the defendant substantially obstructed the conduct of a lawful meeting with the specific intent of bringing

---

6. Tennessee Code Annotated § 39–17–306 regulates "physical action or verbal utterance."

7. Professor Dwight Aarons suggests, in his thoughtfully presented and scholarly amicus curiae brief, that the language of the statute would criminalize such conduct as a citizen's "walking towards Neyland Stadium on a foot-

ball Saturday, from asking directions from three police officers, who are talking among themselves regarding traffic monitoring duties." We disagree with this hypothetical. Such a citizen has the intent of seeking directions, not of preventing the officers from returning subsequently to their duties.

the meeting to an early termination or effectively impairing the conduct of the assemblage by physical action or verbal utterance.

The State presented evidence that the defendant used a bullhorn to shout "Stop killer cops" during a memorial service. "Whether a given instance of misconduct substantially impairs the effective conduct of a meeting depends upon the actual impact of that misconduct on the course of the meeting; the question cannot be resolved merely by asking persons present at the meeting whether they were 'disturbed.'" *In re Kay,* 83 Cal.Rptr. 686, 464 P.2d at 151 (citations omitted).

 Here, the gathering had a solemn purpose with a specific sequence of speakers. A memorial service is, by custom, a quiet, contemplative gathering. The defendant, who had apparently been taking part in protests in the area for several days before the service, used a battery-powered bullhorn to amplify his voice while he stood directly behind the honored families. Memorial service participants testified the defendant's actions disrupted the service and "just drowned out the whole program." Although the defendant argues that he only yelled "Stop killer cops" three or four times, it is clear from the fact that he continued to yell as he was escorted away that he intended to continue his disruption of the service. According to testimony, the master of ceremonies was confused and shaken by the defendant's yelling over his bullhorn. Other participants testified they were not able to hear the intended speaker. Taking the evidence presented in the light most favorable to the State, the jury's verdict of guilty is supported by the evidence.

We conclude that the State showed that the intentional activities of the defendant substantially obstructed the conduct of the meeting by effectively impairing the ability of citizens gathered for a solemn memorial service to freely exercise their right of peaceful assembly.

This assignment is without merit.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we hold that Tennessee Code Annotated § 39–17–306 is constitutionally valid and represents a fair legislative balancing of constitutionally protected rights of citizens. It was appropriately applied to the defendant. We therefore affirm the judgment of the trial court.

HAYES, J., and WALKER, Sp. J., concur.