**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

            v.

NIKOS DELANO DORSEY,
            *Defendant-Appellant.*

No. 04-30152

D.C. No.
CR-A03-0139-JKS

OPINION

Appeal from the United States District Court
for the District of Alaska
James K. Singleton, Chief Judge, Presiding

Argued and Submitted
April 5, 2005—Seattle, Washington

Filed August 10, 2005

Before: William C. Canby, Jr., Richard C. Tallman, and
Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Tallman;
Partial Concurrence and Partial Dissent by Judge Rawlinson

## COUNSEL

Kevin F. McCoy, Assistant Federal Defender, Anchorage, Alaska, for the defendant-appellant.

Jo Ann Farrington, Assistant United States Attorney, Anchorage, Alaska, for the plaintiff-appellee.

## OPINION

TALLMAN, Circuit Judge:

Following a conditional guilty plea, Nikos Delano Dorsey was convicted of possession of cocaine base with intent to distribute, possession of a firearm during and in relation to a drug trafficking offense, and possession of a firearm in a school zone. He challenges his conviction and sentence. We affirm his conviction and remand his sentence for consideration in light of *United States v. Booker*, 125 S. Ct. 728 (2005), and *United States v. Ameline*, 409 F.3d 1073 (9th Cir. 2005).

### I

The following description of the facts is drawn from the record of the prior proceedings, particularly the magistrate judge's findings of fact which were adopted by the district court.

### A

The facts relevant to this appeal primarily took place on the grounds of Bartlett High School in Anchorage, Alaska. On September 2, 2003, while patrolling the school pursuant to a Memorandum of Understanding between the Anchorage Police Department and the school district, Officer Jason Schmidt encountered Dorsey on school grounds.

Officer Schmidt approached Dorsey, who was wearing a bandana and hat in violation of the school's posted dress policy, and asked him to remove his headgear. Dorsey refused, and a verbal confrontation between Dorsey and Officer Schmidt ensued. Although Dorsey eventually complied with Officer Schmidt's direction regarding his headgear, during the course of the dispute Dorsey told Officer Schmidt that he was not a student. Officer Schmidt then instructed Dorsey to leave the school campus. Dorsey initially refused to comply, but did eventually leave the building.

Officer Schmidt followed Dorsey to his car, which was parked in the fire lane outside of the school doors. Officer Clinton Peck, who had overheard much of the foregoing, joined him. They asked Dorsey to explain why he was at Bartlett. Dorsey replied that he wanted to pick up a student named Staphon Livingood, but was unable to identify Livingood's age, grade, or anything else about him. Subsequent investigation confirmed that no student named Staphon Livingood attended Bartlett High.

Officer Schmidt told Dorsey that he was not allowed on school property if he had no legitimate business there, and that if he did have legitimate business he needed to make arrangements through the school ahead of time. The officers warned Dorsey that if he returned to the property, he would be arrested for trespass. The officers then alerted the school staff to this incident. Assistant Principal Tina Johnson-Harris approved the officers' decision to ask Dorsey to leave, and agreed that if Dorsey returned he should be treated as a trespasser.

**B**

Detective Nancy Potter reported to Officers Schmidt and Peck that she had seen a car being driven recklessly around the parking lot at the high school at the end of the school day that same afternoon. Detective Potter's description of the car

and driver matched Dorsey. From Detective Potter's description Officer Schmidt concluded that Dorsey had returned to campus in violation of his prior warning.

At the end of the school day the next afternoon, Officers Schmidt and Peck saw a car speeding erratically through one of the school's parking lots; the car looked similar to the car Dorsey had driven the previous day. The officers pulled the car over; Dorsey was the driver. Officer Schmidt asked Dorsey to step out of the car and, as Dorsey did so, Officer Schmidt noticed the smell of marijuana and that Dorsey's eyes appeared bloodshot and watery. Officer Schmidt told Dorsey that he was under arrest and conducted a protective pat-down search. During the search, Dorsey pulled away from Officer Schmidt, so Schmidt handcuffed Dorsey and put him in the back of Officer Peck's patrol car.

Meanwhile, Officer Peck told Dorsey that he was going to move Dorsey's car, which was blocking traffic. As he did so, he noticed a strong marijuana smell inside Dorsey's car when moving it. After Dorsey had been placed in the back of Officer Peck's car, Peck returned to Dorsey's car and briefly searched it. Officer Peck found money and cocaine base rocks in the console and a Glock pistol between the console and the seat. The officers then secured the car and transported Dorsey to a police substation, where Drug Unit detectives interviewed him.

## C

Following the interview, the officers took Dorsey before a state court magistrate where Dorsey was arraigned. At the same time, the officers applied for a search warrant. The parties dispute whether the officers were ever placed under oath. The magistrate found that probable cause existed, and issued the warrant.

Dorsey's car was searched under the warrant. In between the seat and the console officers found a 9-mm Glock semiau-

tomatic pistol with a loaded extended magazine and a jacketed hollow-point round in the chamber. Inside the console they found a baggie with eight individually wrapped bindles of crack cocaine, two more magazines, and about $400 in cash.

**D**

A federal grand jury indicted Dorsey on three counts. Count One charged him with possession of cocaine base with intent to distribute. *See* 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), 860. Count Two alleged possession of a firearm during and in relation to and in furtherance of a federal drug trafficking crime. *See* 18 U.S.C. § 924(c)(1)(A). Count Three charged possession of a firearm in a school zone. *See* 18 U.S.C. §§ 922(q)(2)(A), 924(a)(4).

Dorsey moved to suppress the evidence derived from his arrest but the district court, relying on the magistrate judge's recommendation, found that the arrest was supported by probable cause, that the initial search was incident to a lawful arrest, and that the second search was either a lawful inventory search or saved by the inevitable discovery doctrine. Dorsey also moved to dismiss the charge under the Gun-Free School Zones Act, 18 U.S.C. § 922(q), arguing that the statute exceeds the scope of Congress's Commerce Clause power. The district court denied Dorsey's motion to dismiss.

Dorsey pled guilty to the indictment, preserving his right to appeal. The district court determined the quantity of cocaine in Dorsey's possession. Dorsey was sentenced to a total of ninety-eight months imprisonment — thirty-seven months for Count One, sixty months for Count Two, and one month for Count Three. This appeal followed.

**II**

Dorsey challenges his arrest, the search of his car, and the admission of Detective Potter's statement at his pretrial sup-

pression hearing. Whether Dorsey's arrest was supported by probable cause is a mixed question of law and fact that we review *de novo*. *United States v. Nava*, 363 F.3d 942, 944 (9th Cir. 2004). We review the validity of a warrantless search *de novo*, and the underlying factual findings for clear error. *United States v. Depew*, 210 F.3d 1061, 1066 (9th Cir. 2000). Alleged violations of the Confrontation Clause and the district court's interpretation of the hearsay rule are reviewed *de novo*. *United States v. Orellana-Blanco*, 294 F.3d 1143, 1148 (9th Cir. 2002).

## A

[1] An arrest is constitutionally valid if the arresting officers had probable cause to make the arrest. *Beck v. Ohio*, 379 U.S. 89, 91 (1964). Officers have probable cause to make an arrest when:

> at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.

*Id.* At the time that Dorsey was arrested for trespass, the officers knew that Dorsey had been warned not to come back to campus without a legitimate purpose, that Dorsey's previous explanation of his purpose had been a lie, that Detective Potter had reported seeing Dorsey the previous afternoon after he had been asked to leave, and that Dorsey was once again on campus.

[2] These facts are sufficient to cause a prudent person to believe that Dorsey had committed or was committing the crime of trespass. In Alaska, a person commits trespass if he "enters or remains unlawfully [ ] in or upon premises[.]" Alaska Stat. § 11.46.330(a)(1). A person has entered or remained unlawfully if he "fail[s] to leave premises . . . that

[are] open to the public after being lawfully directed to do so personally by the person in charge[.]" Alaska Stat. § 11.46.350(a)(2). The Alaska Court of Appeals has interpreted this statute in the context of public property:

> A person can not be convicted under AS 11.46.350(a)(2) of "fail[ing] to leave" a public facility "after being lawfully directed to do so" unless the person fails to heed a reasonably contemporaneous directive to leave, or . . . the person heeds the directive to leave but then returns to the public facility after only a short while.

*Turney v. State*, 922 P.2d 283, 288 (Alaska Ct. App. 1996).[1]

[3] Officers Schmidt and Peck had probable cause to believe that Dorsey had returned to Bartlett after receiving a reasonably contemporaneous directive to leave. The officers had personally directed Dorsey off of the property on September 2, 2003, so they knew that he had been told to leave.[2]

---

[1]The events in *Turney* took place in a courthouse, which was clearly open to the public. Bartlett welcomes the public in a more limited manner. For example, it posts signs indicating that the grounds are closed at night and directing daytime visitors to stop first at the school office. The school district also has a policy denying access to those who do not have "a valid reason for their presence" and warns that "[i]ndividuals who proceed on the District property without proper authorization shall be treated as trespassers and shall be subject to prosecution under relevant state statutes and/or municipal ordinances." If trespass charges had been brought against Dorsey, it is not clear that the court's analysis would have mimicked that in *Turney*, where the public's access to the property at issue was less restricted. However, because the officers had probable cause to arrest Dorsey even under the *Turney* analysis, we do not reach this potential distinction.

[2]Dorsey argues that the officers were not "person[s] in charge" who could direct him to leave under Alaska's trespass statute. However, Officers Schmidt and Peck were at Bartlett as part of a Memorandum of Understanding (MOU) between the school district and the police department. The superintendent of the school district testified that at the time of

They had reason to believe that he had returned within a time period "reasonably contemporaneous" to the time they asked Dorsey to leave because Detective Potter reported seeing someone matching Dorsey's description in the school parking lot later in the day on September 2, 2003. For purposes of establishing probable cause, the officers were justified in relying on Detective Potter's report. *See United States v. Matlock*, 415 U.S. 164, 172-73 (1974). Furthermore, Officers Schmidt and Peck personally observed Dorsey at Bartlett the day after they had told him to leave.[3]

Although the state would need to prove that Dorsey had no legitimate purpose on campus to convict Dorsey of trespass, less is required to establish probable cause for his arrest. After

the events giving rise to this case, the police officers working in the district's schools under the MOU had the authority to arrest for trespass people who did not have a legitimate purpose for being on school property. This authority was clarified, but not altered, by subsequent amendments to the MOU. These facts support the district court's conclusion that Officers Schmidt and Peck were authorized to remove Dorsey from Bartlett as a trespasser.

[3]Alaska law is unclear as to whether a direction to leave the day prior to an arrest is "reasonably contemporaneous." *Turney* quotes a Louisiana case which "deem[s] a request to be reasonably contemporaneous if given a few hours prior to the arrest, the same day as the arrest[,] or such other pre-arrest interval [as is] reasonable under the . . . circumstances of each particular case." 922 P.2d at 287 (quoting *State v. Johnson*, 381 So. 2d 498, 500 (La. 1980)). This reasonable "pre-arrest interval" probably does not include a warning given several weeks prior to the arrest, as this was the fact situation that the *Turney* opinion finds not to be trespass. *Id.* at 288. However, it is not clear where the line of what is "reasonably contemporaneous" falls between the same-day warning described in the quote from the Louisiana case and the several-week interval rejected in *Turney*. Because Detective Potter observed someone matching Dorsey's description at Bartlett on the same day as Officer Schmidt and Peck asked Dorsey to leave, we need not decide whether returning the day after a warning is given creates probable cause to suspect trespass. There was probable cause to believe he had violated the law on the same day he was told to leave. When he came back again the next day, an arrest was surely justified.

Dorsey lied to the officers about his reason for being on campus (claiming to be picking up a fictitious student) the day before his arrest, even if Dorsey had expressed a seemingly legitimate purpose for once again being at Bartlett, the officers could have reasonably suspected him of trespass.

**[4]** Reasonably prudent officers in the arresting officers' position could have concluded that Dorsey had previously engaged in and was again committing trespass; the officers had probable cause for Dorsey's arrest. The district court correctly found that Dorsey's warrantless arrest was supported by probable cause.

**B**

**[5]** Because Dorsey's arrest was supported by probable cause, the search of Dorsey's car was a lawful search incident to arrest. *New York v. Belton*, 453 U.S. 454, 460-61 (1981) (holding that an officer's search of a vehicle pursuant to arrest may lawfully include the entire vehicle, including containers within the vehicle); *Thorton v. United States*, 541 U.S. 615, 124 S.Ct. 2127, 2131-32 (2004) (holding that even when a defendant is not in the car when he is arrested, "it is reasonable to allow officers to ensure their safety and to preserve evidence by searching the entire passenger compartment"). The district court properly ruled that Dorsey's car was searched lawfully incident to arrest.[4]

**C**

Dorsey contends that the admission of Detective Potter's reported sighting of him violated the Confrontation Clause

---

[4]Dorsey argues that the search warrant pursuant to which his car was searched was based on the unsworn statements of Officers Schmidt and Peck and was therefore invalid. We do not reach this issue, because, as is discussed above, the warrantless search of Dorsey's car was lawful, thus the search warrant was unnecessary.

and the Federal Rules of Evidence (FRE) by allowing this "hearsay" testimony at the suppression hearing.

**[6]** Detective Potter's statement was not hearsay in this context. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." FRE 801(c). Potter's statement was not hearsay here because it was not offered to prove that Dorsey had returned to Bartlett on September 2, 2003. If the testimony regarding Detective Potter's statement had been offered for this purpose, perhaps in a criminal trial charging Dorsey with trespass, it would have been hearsay and most likely excluded. FRE 802.

**[7]** Instead, at the suppression hearing, Potter's statement was offered as evidence that Officers Schmidt and Peck had probable cause to arrest Dorsey. The magistrate correctly observed that Potter's statement "was not received or considered for the truth of the matter as to whether Dorsey had in fact trespassed since that ultimate issue would be decided by a different forum." Potter's statement was offered to demonstrate that the officers were reasonable in believing that a crime had occurred; in that context, the statement was not hearsay because it was not offered for the truth of the matter asserted. Advisory Committee Notes to FRE 801 ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay.").

**[8]** No goal would have been served by requiring Detective Potter to testify personally at the suppression hearing. There was no contention that Potter had not made the statement, and her credibility was not at issue because whether Dorsey had actually returned to Bartlett when Potter said he did was immaterial to the inquiry at issue in the suppression hearing. Thus, because the truth of Detective Potter's report was not at issue, her statement was not hearsay. *See Swirsky v. Carey*, 376 F.3d 841, 852 (9th Cir. 2004) (holding that evidence was

not hearsay because it was not proffered for the truth of the content of the evidence); *Calmat Co. v. U.S. Dep't of Labor*, 364 F.3d 1117, 1124 (9th Cir. 2004) (same). We uphold the ruling permitting testimony in the suppression hearing about Detective Potter's statement.

## III

**[9]** We next consider the district court's ruling on Dorsey's motion to dismiss Count Three of the indictment on the ground that the Gun-Free School Zone statute on which it is based, 18 U.S.C. § 922(q)(2)(A), is unconstitutional. It is now a federal crime "knowingly to possess a firearm that has moved in or that otherwise affects interstate or foreign commerce at a place the individual knows, or has reasonable cause to believe, is a school zone." 18 U.S.C. § 922(q)(2)(A). Dorsey argues that this statute exceeds Congress's power under Art. I, § 8, cl. 3 of the United States Constitution ("the Commerce Clause"). We review this constitutional question *de novo*. *United States v. McCoy*, 323 F.3d 1114, 1117 (9th Cir. 2003).

**[10]** In 1995, the Supreme Court found a prior version of § 922(q), also known as the "Gun-Free School Zones Act," unconstitutional. *United States v. Lopez*, 514 U.S. 549 (1995); *see* Pub. L. No. 101-647, Title XVII, § 1702(b)(1), 104 Stat. 4789, 4844 (1990). The version of the statute at issue in *Lopez* made it a federal offense "knowingly to possess a firearm at a place that the individual knows, or has reason to believe, is a school zone." 514 U.S. at 551. The question is whether the addition of the jurisdictional element, which requires that the firearm "has moved in or [ ] otherwise affects interstate or foreign commerce" repairs the constitutional shortfalls announced in *Lopez*. *See* Pub. L. No. 104-208, Div. A, Title I, § 101(f), 110 Stat. 3009-369, 3009-372 (1996) (amending the Gun-Free School Zones Act of 1990).

**[11]** Incorporating a jurisdictional element into the offense has traditionally saved statutes from Commerce Clause chal-

lenges. *See e.g.*, *United States v. Bass*, 404 U.S. 336 (1971). In *Bass*, the Supreme Court considered whether the statutory phrase "in commerce or affecting commerce" in a federal statute that imposed a penalty on any felon "who receives, possesses, or transports in commerce or affecting commerce . . . any firearm" applied to "possesses" and "receives" as well as "transports." *Id.* at 337, 339. In large part to avoid the federalism problems that would result from a broader construction, the Court interpreted the "in commerce or affecting commerce" language to be part of the offense that the government had to prove in each individual case. *Id.* at 349-50. Several years later, the Court revisited the same statute and clarified that the required nexus could be proven by demonstrating that the firearm had previously traveled in interstate commerce; the nexus did not need to be contemporaneous with the offense. *Scarborough v. United States*, 431 U.S. 563, 575-77 (1977).

The *Lopez* decision did not alter this rule that a jurisdictional element will bring a federal criminal statute within Congress's power under the Commerce Clause. In fact, *Lopez* rejected § 922(q) in part because it did not follow *Bass*:

> Unlike the statute in *Bass*, § 922(q) has no express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce.

*Lopez*, 514 U.S. at 562; *see also United States v. Morrison*, 529 U.S. 598, 613 (2000) (holding that the civil remedies in 42 U.S.C. § 13981 were beyond Congress's power under the Commerce Clause because, *inter alia*, "[l]ike the Gun-Free School Zones Act at issue in *Lopez*, § 13981 contains no jurisdictional element establishing that the federal cause of action is in pursuance of Congress'[s] power to regulate interstate commerce").

**[12]** Contrary to the prior version of § 922(q) discussed in *Lopez*, the current version includes a "requirement that [the defendant's] possession of the firearm have a[ ] concrete tie to interstate commerce." *Lopez*, 514 U.S. at 567. This new version of § 922(q) resolves the shortcomings that the *Lopez* Court found in the prior version of this statute because it incorporates a "jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Id.* at 561. This jurisdictional element saves § 922(q) from the infirmity that defeated it in *Lopez*. *See Morrison*, 529 U.S. at 612 ("Such a jurisdictional element may establish that the enactment is in pursuance of Congress' regulation of interstate commerce."); *Scarborough*, 431 U.S. at 575 (finding, with regard to an unrelated statute, that Congress need only require "the minimal nexus that the firearm have been, at some time, in interstate commerce" for the statute to be within Congress's Commerce Clause power).

**[13]** This holding follows circuit precedent on a closely related statute, 18 U.S.C. § 922(g). *See United States v. Davis*, 242 F.3d 1162 (9th Cir. 2001) (per curiam); *United States v. Jones*, 231 F.3d 508 (9th Cir. 2000); *United States v. Polanco*, 93 F.3d 555 (9th Cir. 1996); *United States v. Hanna*, 55 F.3d 1456 (9th Cir. 1995). Section 922(g) prohibits several categories of persons from possessing a firearm "in or affecting interstate commerce" and from receiving a firearm that has been "shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g). In each of the cases to consider the issue, we have found that the jurisdictional element saves § 922 because it "insures, on a case-by-case basis, that a defendant's actions implicate interstate commerce to a constitutionally adequate degree." *Polanco*, 93 F.3d at 563; *see also Davis*, 242 F.3d at 1162-63; *Jones*, 231 F.3d at 514-15; *Hanna*, 55 F.3d at 1462.

**[14]** The Eighth Circuit reached the same conclusion regarding § 922(g), and relied upon it to uphold the constitu-

tionality of the amended § 922(q). *United States v. Danks*, 221 F.3d 1037, 1038-39 (8th Cir. 1999) (per curiam) (citing *United States v. Shelton*, 66 F.3d 991, 992 (8th Cir. 1995) (per curiam)). The Eighth Circuit concluded that because "section 922(q) contains language that ensures, on a case-by-case basis, that the firearm in question affects interstate commerce . . . the amended Act is a constitutional exercise of Congress's Commerce Clause power." *Danks*, 221 F.3d at 1039.

**[15]** We agree with the Eighth Circuit's decision in *Danks*, and follow our own precedent regarding § 922(g), in similarly resolving this issue. Dorsey's motion to dismiss Count Three of the indictment on the ground that 18 U.S.C. § 922(q) is not a valid exercise of congressional power under the Commerce Clause was properly denied.

## IV

Dorsey finally challenges the sentencing court's finding that he had more than three grams of cocaine base in his possession. Dorsey claims that this sentence violated his Sixth Amendment rights under *Blakely v. Washington,* 124 S. Ct. 2531 (2004), because the weight of the cocaine base was determined by the judge by preponderance of the evidence; the weight was neither charged in the indictment or admitted by the defendant in his plea. *See id* at 2537-38.

In an initial test of the crack cocaine seized from Dorsey's car, the cocaine weighed 3.088 grams. A subsequent measurement indicated that the weight was 2.988 grams. At sentencing, the government presented testimony explaining that the difference in weight was due to small amounts of cocaine consumed in laboratory testing, small amounts clinging to the packaging when drugs are removed, and water evaporating from the suspect sample. Dorsey presented no contrary testimony. The district court accepted the government's explanation, and sentenced Dorsey for possession of three or more grams of crack cocaine.

**[16]** Dorsey concedes that he is raising this Sixth Amendment challenge for the first time on appeal. Consequently, we must review his sentence for plain error. *See United States v. Booker*, 543 U.S. \_\_\_, 125 S. Ct. 738, 769 (2005); *United States v. Ameline*, 409 F.3d 1073, 1078 (9th Cir. 2005). He is not entitled to relief unless his sentence amounts to plain error, meaning that there is 1) error, 2) that is plain, and 3) that affects substantial rights. *Ameline*, 408 F.3d at 1078. Because it was given "in reliance upon judge-made findings under the then-mandatory guidelines," Dorsey's sentence was constitutional error and he satisfies the first two prongs of the plain error test. *Ameline*, 409 F.3d at 1078.

**[17]** The next question is whether the error affected Dorsey's substantial rights, i.e. "whether the outcome of [Dorsey's] sentencing was affected by erroneous enhancement of [Dorsey's] sentence on the basis of judge-made findings in the mandatory guidelines regime." *Id.* Dorsey "must demonstrate a reasonable probability that he would have received a different sentence had the district judge known that the sentencing guidelines were advisory." *Id.* In cases, like this one, where "the record does not provide an inkling of how the district court would have proceeded had it known that the Guidelines were advisory rather than mandatory" the proper course of action is to "remand to the district court to answer the question whether the sentence would have been different had the court known that the Guidelines were advisory." *Id.* at 1078-79. Accordingly, we remand Dorsey's challenge to his sentence to the district court for consideration in light of *Booker* and *Ameline*.

**CONVICTION AFFIRMED; SENTENCE REMANDED.**

RAWLINSON, Circuit Judge, concurring in the result, dissenting in part:

I concur in the result in this case because, and only because, of the Supreme Court's recent ruling in *Devenpeck v. Alford*, 125 S. Ct. 588 (2004). In *Devenpeck,* the Court rejected our decision that probable cause to arrest must be predicated upon an offense that is "closely related" to the offense invoked by the arresting officer as the basis for arrest. *See id.* at 593. The Supreme Court reiterated its prior holdings that "a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that *a* criminal offense has been or is being committed." *Id.* (citations omitted) (emphasis added).

In this case, the magistrate judge specifically found that there was probable cause to arrest Dorsey for reckless driving. Because of that fact, the arrest was lawful, and evidence discovered during the search incident to Dorsey's arrest was admissible. *See id., see also United States v. Smith*, 389 F.3d 944, 952 (2004) (holding "that as long as there is probable cause to make an arrest, and the search is conducted roughly contemporaneously with the arrest, the search-incident-to-arrest doctrine applies and no warrant is required.").

I respectfully disagree that there was probable cause to arrest Dorsey for the crime of trespassing. Alaska Stat. 11.46.330(a)(1) defines trespass as "enter[ing] or remain[ing] unlawfully . . . upon premises." A person has entered or remained unlawfully on public property if he "fail[s] to leave premises . . . that [are] open to the public after being lawfully directed to do so *personally by the person in charge*." Alaska Stat. 11.45.350(a)(2) (emphasis added). The Alaska Court of Appeals has interpreted Alaska Stat. 11.45.350(a)(2) in the context of public property, as follows:

> A person cannot be convicted under
> AS 11.46.350(a)(2) of "*failing to leave*" a public

> facility *"after being lawfully directed to do so"*
> unless the person fails to heed a reasonably contem-
> poraneous directive to leave, or . . . the person heeds
> the directive to leave but then returns to the public
> facility after only a *short while*.

*Turney v. State*, 922 P.2d 283, 288 (Alaska App. 1996) (emphasis added).

*Turney* involved a courthouse protester who was given a letter by the court administrator informing Turney that he was "prohibited from entering or remaining on court property to engage in protest activities, picketing or pamphleteering." *Id.* at 285. Approximately two months later, Turney returned to the courthouse, again engaging in protest activities. *Id.* A court employee called the Alaska State Troopers, who responded. *Id.* One of the troopers asked Turney to leave, and Turney complied. *Id.* Turney was subsequently charged with and convicted of trespass. *Id.* "[T]he State's theory of prosecution was that Turney had committed trespass by returning to the courthouse to renew his protect activities after receiving [the court administrator's] letter." *Id.* at 286.

In reaching its decision to reverse Turney's conviction, *id.* at 290, the Alaska Court of Appeals started with the premise that

> a criminal trespass statute which applies to public
> property in general, and which proscribes refusing or
> failing to leave a public building or public grounds
> upon being requested to do so by an *authorized
> employee*, limits the power of public officials to noti-
> fying people, *in specified circumstances*, that they
> may not remain on the property and *does not permit
> them to bar entry*.

*Id.* at 287 (citation and alterations omitted) (emphasis added).

The *Turney* decision discussed a Maryland case that is remarkably similar to the case before us. In that case, *In re Appeal No. 631,* 383 A.2d 684 (Md. 1978), the defendant visited a school after being previously told not to return. When discovered, the defendant was taken to the vice-principal to explain his return to the premises. Having failed to give a satisfactory explanation, the defendant was arrested and convicted of trespassing. *Id.* at 685.

In reversing the conviction, the Maryland Court of Appeals noted that the defendant was never asked to leave the school premises on the day of the arrest. *Id.* at 687. "No request having been given [on that day], there was none to disobey." *Id.* The Maryland Court emphasized that the previous requests to leave could not serve as the predicate for the trespass charge. *Id.*

*State v. Johnson,* 381 So. 2d 498 (La. 1980), is also a similar case cited in the Alaska Court of Appeals' decision. In *Johnson*, the Louisiana Supreme Court, like the Maryland Court of Appeals, focused on the lack of a request to leave on the day of the alleged trespass. *Id.* at 500. The Louisiana Supreme Court construed the trespass statute as incorporating "a reasonably contemporaneous" request to leave. *Id.* The Louisiana Supreme Court defined reasonably contemporaneous as "a few hours prior to the arrest, the same day as the arrest, or such other pre-arrest interval reasonable under the . . . circumstances." *Id.*

Finally, the Alaska Court of Appeals turned to New York cases interpreting that state's trespass statute. The Alaska court summarized the New York approach as consistent with that of Maryland and Louisiana. *See Turney*, 922 P.2d at 288. "[U]nder New York's general trespass statutes, the supervisor of a public facility has no such power to bar an individual from ever returning to the facility. Even though a person has previously been ordered to leave and not return, this person

may not be prosecuted for trespass merely for returning on another occasion." *Id.* (citations omitted).

As informed by case precedent from three other states, the Alaska Court of Appeals' interpretation of the trespass statute poses two major impediments to finding probable cause for a trespass arrest in this case. The first is that Dorsey was not "lawfully directed" to leave the school. The second is that the record does not support the finding that he failed to leave the premises or was directed to leave on the day he was arrested.

Alaska Stat. 11.46.330(a)(1) provides that a direction to leave public premises must be done "personally by the person in charge." The Anchorage School District developed a written warning to be given to potential trespassers. The warning specifies that it is to be given by an Alaska School District representative, not an Alaska Police Department representative. This distinction was known to the Alaska School District and Alaska Police Department, as evidenced by the Memorandum of Understanding (MOU) between those two entities, where representatives of each were designated as signees.[1]

As the Maryland Court of Appeals recognized, if the trespass warning is not given as specified in the statute, no trespass occurs upon re-entry onto the premises. *See In Re Appeal No. 631,* 383 A.2d at 687. In this case, no authorized representative of the Anchorage School District directed Dorsey to vacate the premises. Consequently, the provisions of the trespass statute were never triggered.

There is also no evidence in the record that Dorsey failed to leave the school premises when directed to do so. The only evidence in the record is that Dorsey was seen on campus later that day, which in no way indicates that he never left.

_____

[1]The MOU was subsequently amended to specifically provide that Alaska Police Department officers were authorized to provide the trespass warning.

Further complicating the trespass charges is that, as in *Turney*, Dorsey was not directed to leave the campus on the day he was arrested for trespass. The Alaska Court of Appeals concluded that under these circumstances, no trespass occurred. *Turney*, 922 P.2d at 286. The Alaska Court of Appeals noted that the Alaska statute "does not authorize a government official to bar a person from returning to a public building and its surrounding property in perpetuity." *Id.* Yet that is exactly what the government officials attempted with Dorsey. I cannot agree that the arrest for trespass was supported by probable cause, and dissent from that portion of the opinion concluding otherwise.