# Constitutionality of the Matthew Shepard
# Hate Crimes Prevention Act

The prohibition in proposed section 249(a)(1) of S. 909, the Matthew Shepard Hate Crimes Prevention Act—against willfully causing bodily injury to any person, or attempting to cause bodily injury to any person through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, "because of the actual or perceived race, color, religion, or national origin of any person"—would be a permissible exercise of Congress's authority to enforce the Thirteenth Amendment, at least insofar as the violence is directed at members of those religions or national origins that would have been considered races at the time of the adoption of the Thirteenth Amendment.

The prohibition in proposed section 249(a)(2) of S. 909—against willfully causing bodily injury to any person, or attempting to cause bodily injury to any person through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, "because of the actual or perceived religion, national origin, gender, sexual orientation, gender identity or disability of any person"—would be a permissible exercise of Congress's authority under the Commerce Clause, because it would require the government to allege and prove beyond a reasonable doubt in each case that there is an explicit and discrete connection between the proscribed conduct and interstate or foreign commerce.

June 16, 2009

MEMORANDUM OPINION FOR THE
ASSISTANT ATTORNEY GENERAL
OFFICE OF LEGISLATIVE AFFAIRS

You have asked for our views on the constitutionality of a pending bill, the Matthew Shepard Hate Crimes Prevention Act, S. 909, 111th Cong. (as introduced in the Senate, Apr. 28, 2009). In particular, you have asked us to review section 7(a) of S. 909, which would amend title 18 of the United States Code to create a new section 249, which would establish two criminal prohibitions called "hate crime acts."

First, proposed section 249(a)(1) would prohibit willfully causing bodily injury to any person, or attempting to cause bodily injury to any person through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, "because of the actual or perceived race, color, religion, or national origin of any person." This provision is similar to an existing federal law, 18 U.S.C. § 245 (2006), the principal difference being that the new section 249(a)(1), unlike section 245, would not re-

quire the prosecutor to prove that the victim was or had been "participating in or enjoying any benefit, service, privilege, program, facility or activity provided or administered by any State or subdivision thereof."

Second, proposed section 249(a)(2) would prohibit willfully causing bodily injury to any person, or attempting to cause bodily injury to any person through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, "because of the actual or perceived religion, national origin, gender, sexual orientation, gender identity or disability of any person," S. 909, sec. 7(a), § 249(a)(2)(A), but only if the conduct occurs in at least one of a series of defined "circumstances" that have a specified connection with or effect upon interstate or foreign commerce, *id.* § 249(a)(2)(B). This new provision would prohibit certain forms of discriminatory violence—namely, violence committed because of a person's actual or perceived gender, sexual orientation, gender identity or disability—that are not addressed by the existing section 245 of title 18.[1]

S. 909 is, in these respects, nearly identical to a bill this Office reviewed in 2000.[2] In our analysis of that proposed legislation, which your Office transmitted to Congress, we concluded that the bill would be constitutional. *See* Letter for Edward Kennedy, United States Senate, from Robert Raben, Assistant Attorney General, Office of Legislative Affairs, Department of Justice (June 13, 2000); *see also* S. Rep. No. 107-147, at 15–23 (2002) ("Senate Report") (reprinting the OLA letter containing the 2000 OLC analysis as an explanation of the constitutional basis for such legislation). In 2007, however, the Office of Management and Budget indicated to the 110th Congress that one provision of such legislation would raise constitutional concerns, *see* Statement of Administration Policy on H.R. 1592 (May 3, 2007), as did the Attorney General, *see* Letter for Carl Levin, Chairman, Senate Committee on Armed Services,

---

[1] A new proposed section 249(a)(3) would make the same conduct unlawful if done within the special maritime or territorial jurisdiction of the United States—a provision that does not raise any serious questions with respect to Congress's authority. *See United States v. Sharpnack*, 355 U.S. 286, 288 (1958).

[2] The principal material difference is that section 249(a)(2) of S. 909 encompasses violence on the basis of a person's real or perceived gender identity, something that the 2000 legislation did not address.

from Michael B. Mukasey, Attorney General, at 6 (Nov. 13, 2007) (regarding section 1023 of H.R. 1585).

We have carefully reviewed the relevant legal materials and now conclude, as we did in 2000, that the legislation is constitutional. The Attorney General concurs in this view.

## I.

As we explained in 2000, *see* Senate Report at 16–18, we believe Congress has authority under section 2 of the Thirteenth Amendment to punish racially motivated violence as part of a reasonable legislative effort to extinguish the relics, badges and incidents of slavery. Congress may rationally determine, as it would do in S. 909, that "eliminating racially motivated violence is an important means of eliminating, to the extent possible, the badges, incidents, and relics of slavery and involuntary servitude," and that "[s]lavery and involuntary servitude were enforced . . . through widespread public and private violence directed at persons because of their race." S. 909, § 2(7); *see also* H.R. 1585, 110th Cong. § 1023(b)(7) (2007) (same).[3]

Like the current 18 U.S.C. § 245, proposed section 249(a)(1) of title 18 would not be limited by its terms to violence involving racial discrimination: It would criminalize violence committed "because of the actual or perceived race, color, *religion, or national origin* of any person." S. 909 explains that "in order to eliminate, to the extent possible, the badges, incidents, and relics of slavery, it is necessary to prohibit assaults on the basis of real or perceived religions or national origins, at least to the extent such religions or national origins were regarded as races at the time of the adoption of the 13th, 14th, and 15th amendments." *Id.* § 2(8).

As we have previously concluded, under existing case law the proscription of violence motivated by "religion" and "national origin" would constitute a valid exercise of Congress's Thirteenth Amendment authority insofar as "the violence is directed at members of those religions or national origins that would have been considered races at the time of the

---

[3] Given our conclusion that Congress possesses authority to enact this provision under the Thirteenth Amendment, we do not address whether Congress might also possess sufficient authority under the Commerce Clause or the Fourteenth Amendment. *See United States v. Nelson*, 277 F.3d 164, 174–75 & n.10 (2d Cir. 2002).

adoption of the Thirteenth Amendment." Senate Report at 17–18; *see also Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 610–13 (1987) (holding that the prohibition of race discrimination in 42 U.S.C. § 1981, a Reconstruction-era statute that was enacted pursuant to, and contemporaneously with, the Thirteenth Amendment, extends to discrimination against Arabs, as Congress intended to protect "identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics"); *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617–18 (1987) (holding that Jews can state a claim under 42 U.S.C. § 1982, another antidiscrimination statute enacted pursuant to, and contemporaneously with, the Thirteenth Amendment, because Jews "were among the peoples [at the time the statutes were adopted] considered to be distinct races"); *Hodges v. United States*, 203 U.S. 1, 17 (1906) ("Slavery or involuntary servitude of the Chinese, of the Italian, of the Anglo-Saxon, are as much within its compass as slavery or involuntary servitude of the African."); *United States v. Nelson*, 277 F.3d 164, 176–78 (2d Cir. 2002) (concluding that 18 U.S.C. § 245 could be applied constitutionally to protect Jews against crimes based on their religion, because Jews were considered a "race" when the Thirteenth Amendment was adopted). While it is true that the institution of slavery in the United States, the abolition of which was the primary impetus for the Thirteenth Amendment, primarily involved the subjugation of African Americans, it is well established by Supreme Court precedent that Congress's authority to abolish the badges and incidents of slavery extends "to legislat[ion] in regard to 'every race and individual.'" *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 288 n.18 (1976) (quoting *Hodges*, 203 U.S. at 16–17).[4]

Although "there is strong precedent to support the conclusion that the Thirteenth Amendment extends its protections to religions directly, and thus to members of the Jewish religion, without the detour through historically changing conceptions of 'race,'" *Nelson*, 277 F.3d at 179, it remains an open question whether and to what extent the Thirteenth Amendment empowers Congress to address forms of discrimination short of slavery

---

[4] In *McDonald*, for example, the Supreme Court held that 42 U.S.C. § 1981, a Reconstruction-era statute that was enacted pursuant to, and contemporaneously with, the Thirteenth Amendment, prohibits racial discrimination in the making and enforcement of contracts against all persons, including whites. 427 U.S. at 286–96.

and involuntary servitude with respect to religions and national origins that were *not* considered "races" in 1865. Accordingly, to the extent violence is directed at victims on the basis of a religion or national origin that was not regarded as a "race" at the time the Thirteenth Amendment was ratified, prosecutors may choose to bring actions under the Commerce Clause provision of S. 909, i.e., proposed 18 U.S.C. § 249(a)(2), if they can prove the elements of such an offense. *See* Senate Report at 15.

Proposed section 249(a)(1) differs from the current 18 U.S.C. § 245 in that it would not require the government to prove that the defendant committed the violence because the victim was or had been "participating in or enjoying any benefit, service, privilege, program, facility or activity provided or administered by any State or subdivision thereof."[5] The outer limits of the expansive list of specified activities in section 245 have not

---

[5] Section 245(b)(2) makes it a crime, "whether or not acting under color of law, by force or threat of force willfully [to] injure[], intimidate[] or interfere[] with, or attempt[] to injure, intimidate or interfere with . . . any person because of his race, color, religion or national origin and because he is or has been—

"(A) enrolling in or attending any public school or public college;

"(B) participating in or enjoying any benefit, service, privilege, program, facility or activity provided or administered by any State or subdivision thereof;

"(C) applying for or enjoying employment, or any perquisite thereof, by any private employer or any agency of any State or subdivision thereof, or joining or using the services or advantages of any labor organization, hiring hall, or employment agency;

"(D) serving, or attending upon any court of any State in connection with possible service, as a grand or petit juror;

"(E) traveling in or using any facility of interstate commerce, or using any vehicle, terminal, or facility of any common carrier by motor, rail, water, or air;

"(F) enjoying the goods, services, facilities, privileges, advantages, or accommodations of any inn, hotel, motel, or other establishment which provides lodging to transient guests, or of any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility which serves the public and which is principally engaged in selling food or beverages for consumption on the premises, or of any gasoline station, or of any motion picture house, theater, concert hall, sports arena, stadium, or any other place of exhibition or entertainment which serves the public, or of any other establishment which serves the public and

"(i) which is located within the premises of any of the aforesaid establishments or within the premises of which is physically located any of the aforesaid establishments, and

"(ii) which holds itself out as serving patrons of such establishments."

been conclusively defined, but courts have concluded that the section protects, *inter alia*, drinking beer in a public park (*see United States v. Allen*, 341 F.3d 870 (9th Cir. 2003)), and walking on a city street (*see Nelson*, 277 F.3d 164). Although it is not clear that Congress included the activities element of section 245 in order to justify an exercise of its Thirteenth Amendment enforcement powers,[6] the courts have held that section 245 is proper Thirteenth Amendment legislation. *See, e.g.*, *Nelson*, 277 F.3d 164; *Allen*, 341 F.3d 870.

The Supreme Court's decisions in *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968), and *Griffin v. Breckenridge*, 403 U.S. 88 (1971), support the further judgment that the Thirteenth Amendment does not require such a federal-activities element. In *Jones*, the Court upheld section 1 of the Civil Rights Act of 1866 (now 42 U.S.C. § 1982) as a valid exercise of Congress's Thirteenth Amendment enforcement authority. The statute in *Jones* was limited to discriminatory interferences with the rights to make contracts and buy or sell property, but the Court did not rest its approval on that limitation. Instead, the Court wrote, "[s]urely Congress has the power under the Thirteenth Amendment rationally to determine what are the badges and the incidents of slavery, and the authority to translate that determination into effective legislation." 392 U.S. at 440. Similarly, in *Griffin*, the Court held that the Thirteenth Amendment supported application of the Ku Klux Klan Act (now 42 U.S.C. § 1985) to a case of racially motivated violence intended to deprive the victims of what the Court called "the basic rights that the law secures to all free men," 403 U.S. at 105—which in that case, according to the complaint, included the "right to be secure in their person" and "their rights to travel the public highways without restraint," *id.* at 91–92. The Court again endorsed the broad *Jones* formulation, which contains no interference-with-protected-activities limitation: "Congress has the power under the Thirteenth Amendment rationally to determine what are the badges and the incidents of slavery, and the authority to translate that determination into effective legislation." *Id.* at 105. To be sure, "there exist indubitable connections

---

[6] *See Nelson*, 277 F.3d at 191 n.26 (explaining that Congress included the "participating in or enjoying civil rights" requirement in section 245 for purposes of providing a basis for the provision under the Fourteenth Amendment and possibly also the Fifteenth Amendment).

. . . between post Civil War efforts to return freed slaves to a subjugated status and private violence directed at interfering with and discouraging the freed slaves' exercise of civil rights in public places." *Nelson*, 277 F.3d at 190. But there are also such "indubitable connections" "between slavery and private violence directed against despised and enslaved groups" more generally. *Id.*[7] In light of these precedents, and consistent with our conclusion in 2000, *see* Senate Report at 16–17, we think it would be rational at the very least for Congress to find that "[s]lavery and involuntary servitude were enforced . . . through widespread public and private violence directed at persons because of their race" and that "eliminating racially motivated violence is an important means of eliminating, to the extent possible, the badges, incidents, and relics of slavery and involuntary servitude," S. 909, § 2(7), regardless of whether the perpetrator in a particular case is attempting to deprive the victim of the use of the activities covered by the current section 245.

We therefore conclude, as we did in 2000, that the prohibition of discriminatory violence in proposed section 249(a)(1) would be a permissible exercise of Congress's broad authority to enforce the Thirteenth Amendment.

## II.

Proposed section 249(a)(2) would be a proper exercise of Congress's authority under the Commerce Clause, U.S. Const. art. I, § 8, cl. 3, because it would require the government to allege and prove beyond a reasonable doubt in each case that there is an explicit and discrete connection between the proscribed conduct and interstate or foreign commerce.

---

[7] As the Second Circuit noted in *Nelson*, the Supreme Court has limited the scope of Congress's enforcement authority under section 5 of the Fourteenth Amendment in a series of recent cases. 277 F.3d at 185 n.20. But as that court also noted, these precedents do not address the Thirteenth Amendment, which contemplates an inquiry that the Supreme Court has referred to as the "inherently legislative task of defining involuntary servitude." *Id.* (quoting *United States v. Kozminski*, 487 U.S. 931, 951 (1988)). The court of appeals in *Nelson* further explained that "the task of defining 'badges and incidents' of servitude is by necessity even more inherently legislative." *Id.* Finally, we note that the Thirteenth Amendment, unlike the Fourteenth Amendment, contains no state-action requirement, a distinction of relevance in determining Congress's authority to regulate private, racially motivated violence. *See* Senate Report at 18.

In particular, it would require that the offense have occurred "in any circumstance described in [proposed 18 U.S.C. § 249(a)(2)(B)]." Those enumerated circumstances are that:

> (i) the conduct described in subparagraph (A) occurs during the course of, or as the result of, the travel of the defendant or the victim—
>
>> (I) across a State line or national border; or
>>
>> (II) using a channel, facility, or instrumentality of foreign commerce;
>
> (ii) the defendant uses a channel, facility, or instrumentality of interstate or foreign commerce in connection with the conduct described in subparagraph (A);
>
> (iii) in connection with the conduct described in subparagraph (A), the defendant employs a firearm, dangerous weapon, explosive or incendiary device, or other weapon that has traveled in interstate or foreign commerce; or
>
> (iv) the conduct described in subparagraph (A)—
>
>> (I) interferes with commercial or other economic activity in which the victim is engaged at the time of the conduct; or
>>
>> (II) otherwise affects interstate commerce.

S. 909, sec. 7(a), § 249(a)(2)(B). As we explained in 2000, *see* Senate Report at 18–23, requiring proof of at least one of these "jurisdictional" elements would "ensure, through case-by-case inquiry, that the [offense] in question affects interstate commerce." *United States v. Lopez*, 514 U.S. 549, 561 (1995). Nothing in the law since 2000 calls this analysis into question.[8]

---

[8] *See, e.g.*, *United States v. Dorsey*, 418 F.3d 1038, 1045–46 (9th Cir. 2005) (upholding 18 U.S.C. § 922(q)(2)(A), which makes it a crime "knowingly to possess a firearm that has moved in or that otherwise affects interstate or foreign commerce at a place the individual knows, or has reasonable cause to believe, is a school zone"); *United States v. Capozzi*, 347 F.3d 327, 335–36 (1st Cir. 2003) (upholding the Hobbs Act, 18 U.S.C. § 1951(a), which makes it a federal crime to commit or attempt to commit extortion that "in any way or degree, obstructs, delays or affects [interstate] commerce").

### III.

For these reasons we adhere to our 2000 conclusion that the new criminal offenses created in S. 909 would be wholly constitutional.

MARTIN S. LEDERMAN
*Deputy Assistant Attorney General*
*Office of Legal Counsel*